## John Drennan v. The People.

The statute (*Comp. L.* § 5954) which provides that "The term 'felony' when used in this title, or in any other statute, shall be construed to mean an offense for which the offender on conviction shall be liable by law to be punished by death, or by imprisonment in the State prison" is only a legislative definition of the term "felony," as used in those provisions of the statute where neither the particular offense, nor its grade, is otherwise indicated than by the use of this term; and where, therefore, the definition became necessary, as it was not intended to be used in the common law sense. Those acts which were felonies at the common law remain such notwithstanding this section, though by statute they may be subjected to a less punishment than that here mentioned.

And therefore larceny, though of property to the value of less than twenty-five dollars, being a felony at the common law, is still a felony in this State.

A constable who has knowledge that a warrant has been issued for the arrest of a person for felony, may himself lawfully make the arrest without having the warrant in his possession. But he should inform the person arrested of the facts, or at least of the offense for which he is arrested.

Where an officer, attempting to make an arrest on reasonable suspicion of felony, is asked for his authority, and says he has a warrant, but refuses to produce it, and gives no explanation whatever, but makes the arrest with circumstances of violence, and the person arrested resists and kills the officer, he will not be guilty of murder in so doing.

*Heard April 16th,* 1861. *Decided May 7th.*

Error to the Recorder's Court of Detroit.

The plaintiff in error was convicted on an information for assaulting one John Gore, with intent to murder.

On the trial, John Gore testified as follows: "I am a constable of the First Ward; I know defendant; on the 9th of February, 1861, at about one o'clock in the morning, I arrested defendant at a house kept by one Hill, on Gratiot street. I told him I was an officer; had my star on; he knew I was an officer, a constable: I told him I wanted him to go with me; he asked what for; I told him I had a warrant for him; he said he would not go unless I showed him the warrant: I then took hold of him by the collar with my right hand, and took him out of doors; when we got outside the door he took a revolver out of his pocket and cocked it; I heard the click, and said to McKay, "be careful, he's got a pistol:" I then took hold of his right arm with my left hand,

and letting go the hold of my right hand on his collar, seized the pistol around the barrel; I endeavored to take the pistol away from defendant and immediately the pistol snapped, the hammer came down upon my hand between my thumb and forefinger; it caught upon the skin of my hand, between the forefinger and thumb; the pistol was pointed about at the middle of my body, when I took hold of it; the pistol had four barrels, all loaded; I had no warrant for the arrest of defendant; I knew one had been issued against him and was in the hands of officer Van Stan; the charge against him was stealing a pair of gloves of the value of twelve shillings; I was present in the Justice's office when the complaint was made and the warrant issued; the warrant was given to me, and I afterwards gave it to Van Stan in the Justice's office: he, Drennan, said nothing to me before drawing his pistol: he said in the house he would not go till I showed him my papers."

James McKay testified: "I am a deputy sheriff; know Gore and Drennan; Gore and I were returning home from jail on the 9th February; we went into Hill's place on Gratiot street; we sat down by the stove, and in about five minutes Drennan and Penwell came in. Gore said "how d'ye do, Johnny," speaking to defendant; "I want you, I have got a warrant for you:" defendant replied, "Show me the warrant." Gore refused to do so, saying he wasn't obliged to show it; Gore told him he must come with him; took hold of defendant, and jerked him to the door. I followed them out and closed the door. Gore said "look out, he's got a pistol:" saw Gore seize his hand. I took hold of his left shoulder and arm; he scuffled a little and we threw him down. Just as I pulled him down Gore held up a revolver. I heard no noise either of cocking or pulling off the pistol. Then we took him to jail. Gore there showed me the mark made by the hammer of the pistol striking on his hand. Drennan was pretty drunk."

John Van Stan testified: "I am an officer in this city. There was a warrant out against Drennan on February 9th, for stealing a pair of gloves, issued by Justice Fecht. The warrant was in my possession; I arrested the person jointly charged with Drennan, on the same night: afterwards gave the warrant to Gore."

The prisoner called Wm. Penwell, who testified: "I was with Drennan on the night in question, and had been for some four or five hours before we reached Hill's place. I saw him have a pistol just before we got to Hill's; a dog rushed out at us, and Drennan said he had been troubled enough with dogs, and wouldn't be any more; he then drew his pistol to shoot the dog; we then went into Hill's; Gore said "halloo Johnny, I want you." Drennan refused to go with him unless he would show his warrant. Then Gore took hold of Drennan and took him out of doors. I followed in less than a minute, and when I got out Gore and McKay had Drennan by the collar taking him off to jail; Drennan was pretty drunk."

The case being submitted on this evidence, the Recorder charged the jury, among other things, as follows: "If you find that the prisoner drew the pistol and cocked it with an intention to kill Gore, but was prevented from so doing, then he is guilty as charged. If Gore knew that there was a warrant out for the arrest of the prisoner, he, as an officer, had a legal right to arrest him, and had the prisoner intentionally killed him, it would have been murder."

The plaintiff in error being convicted, the case was brought to this Court for review on exceptions to this charge.

*H. M. & W. E. Cheever*, for plaintiff in error, argued that the offense charged upon Drennan in the warrant issued by Justice Fecht being a misdemeanor only, the arrest by Gore was unlawful; 1 *Chit. Cr. L.* 20; 1 *Hale*, 587; 1 *East P. C.* 303; 1 *Russ. on Cr.* 599, 601; 10 *Ad. & El.* 358. And consequently if death had ensued from

the assault made by him, Drennan would have been guilty of manslaughter only, and not murder; 1 *Russ. on Cr.* 596, 599; 1 *Chit. Cr. L.* 18; 7 *C. & P.* 244; *Ibid.* 775; *Ibid.* 817; 1 *Mood. C. C.* 132; *Ibid.* 80; *Ibid.* 394; 1 *C. & M.* 180; 3 *Yerg.* 392; 2 *Wheeler C. C.* 495.

In this case the violence of Drennan was plainly pro-voked by the irregular and unlawful conduct of Gore.

*C. Upson, Attorney General,* for the People:

The offense in question is a felony at the common law : *Whart. Cr. L.* 1; 4 *Bl. Com.* 99; 1 *Hale P. C.* 530, 587. The statute has not made it a misdemeanor. It only defines statute felonies, and leaves petit larceny untouched, and to remain in force in respect to all questions controlled by the common law.—3 *Hill,* 255; 3 *Park. Cr. R.* 249. And the constable was authorized to make the arrest. 5 *Bing.* 363.

CHRISTIANCY J.:

Is larceny to the amount of one dollar and fifty cents (in resisting the arrest for which the assault was made) an offense for which the constable might arrest the offender under the circumstances of this case, without having the warrant in his possession? This is the main question in the case. It is admitted that, if the larceny charged was a felony, the constable under the circumstances had a right to make the arrest, and that, had the assault made by the prisoner in resisting the arrest, resulted in killing the con-stable, such killing would have been murder, unless the conduct of the officer in making the arrest was such as in some measure to excuse the defendant.

But it is insisted by the counsel for the prisoner that larceny to an amount less than twenty-five dollars, though a felony at common law, is not such under our statutes, because not punishable with death or by imprisonment in the State prison.

The statute relied upon is section 18 chapter 161 Revised

Statutes of 1846 (*Comp. L.* § 5954): "The term felony when used in this title, or in any other statute, shall be construed to mean an offense for which the offender, on conviction, shall be liable by law to be punished with death, or by imprisonment in the State prison."

This provision is but a legislative definition of the term felony as used in certain provisions of the statute; and its effect can only be known by reference to those provisions where the term is used. Of itself, without such reference, it has no effect upon any offense whatever. Nor can it be reasonably supposed it was intended to extend to those provisions of the statutes (of which there are two cases at least in the same Revision;— *Ch.* 154 §§ 35 and 36; *Comp. Laws*, §§ 5779 and 5780)—which in defining the offense have expressly designated it as a felony, and made it punishable in the State prison; for in such case no such general definition was required. Nor is there any more reason to infer that, where a particular provision of the same act (for the whole Revision was passed as one act) has expressly designated a particular statute offense as a misdemeanor, this definition was intended to convert it into a felony, though the provision defining the offense has made it punishable by imprisonment in the State prison. See a case of this kind, *R. S. Ch.* 19 § 5 (*Comp. L.* § 5917).

We must therefore understand this provision as intended to apply only to those provisions where neither the particular offense nor its grade is otherwise indicated than by the use of the term felony, and where, therefore, the definition became necessary, as it was not intended to be used merely in the common law sense.

This definition became necessary to fix the meaning of the term in the following provisions, contained in the Revision; sections 1, 2, 3, 4 and 5 of Chapter 161 (*Comp. L.* §§ 5937 *to* 5941) in reference to aiders and abetters, accessories, &c., and the mode of their prosecution; section 28 chapter 153 of R. S. (*Comp. L.* § 5738) in reference to

assaults with intent to commit a "felony"; sections 10, 12, 13 and 14, chapter 154 of R. S. (*Comp. L.* §§ 5754, 5756, 5757 and 5758) in reference to breaking and entering houses and other buildings with intent to commit a "felony"; section 19 chapter 164 of R. S. (*Comp. L.* § 6028) in reference to inspection of indictments for "felony"; section 14 chapter 165 of R. S. (*Comp. L.* § 6081) giving the right of separate trials where two or more are jointly indicted "for felony;" and section 9 of the same chapter (*Comp. L.* § 6076) requiring the personal presence on trial of a party indicted for "felony."

It was for the purpose of fixing the meaning of the term in these and similar cases that this definition was given; for a clear apprehension of the full force and effect of the definition, we have only to substitute the definition itself for the term defined, as the two must of necessity be identical in effect; we shall then read, instead of the word felony wherever it occurs in these provisions, the words, "an offense for which the offender on conviction shall be liable by law to be punished with death or by imprisonment in the State prison."

It will thus be readily perceived that this statute definition does not necessarily make all offenses which are punishable with death or by imprisonment in the State prison felonies, to all intents and purposes, as would have been the effect of a direct general enactment, that all offenses thus punishable should be felonies; because, in the latter case, all the consequences and incidents of felony at common law must attach, except so far as the same might have been cut off or modified by the statute, or required by manifest public policy to be rejected. But this definition, operating merely by reference, can have the effect only to make them felonies within this statute definition, and to the extent, and with the incidents and consequences, indicated by the respective sections or provisions of the statute referred to where the term felony is thus used—though there may

be strong reasons, for the sake of uniformity and by ana-
logy to common law felonies, to consider them as drawing
after them the usual incidents of the latter. But while
this definition, by reference, includes for the purposes men-
tioned, not only statute offenses, but all offenses at com-
mon law which by our statutes are made punishable in
the manner indicated, whether felonies or misdemeanors at
common law; it is clear, I think, that even as to those
common law felonies thus punishable, it can have no other
effect than to render them subject to the particular pro-
visions of the statute, where the word felony is thus used,
neither adding to nor taking from them any of the com-
mon law incidents of felony, except so far as these par-
ticular provisions may have that effect.

And as to those common law felonies not thus punish-
able by our statutes, they are in no way affected, either
by the definition or by the provisions to which that
definition refers; for the plain reason that they do not
come within either, but remain felonies at common law,
in the same manner as if this statute definition had never
been adopted. And the liability to arrest without warrant,
incident to common law felonies, still remains untouched,
by this or any other statute of this State.

The conclusions at which I have arrived as to the
effect of this statute definition, are exactly in accordance
with the construction given by the courts of New York
to the same provision in their statute (1 *N. Y. Rev. Stat.
part.* 4, *title* 7, *ch.* 1 § 30), from which our statute defini-
tion was copied. The question under their statute was
substantially the same as under ours, though the particu-
lar provisions to which the definition had reference, differed
slightly in the detail.

In *Ward v. People*, 3 *Hill*, 395, it was held that petit
larceny (which by their statute was defined to be larceny
to the amount of twenty-five dollars or under—*Rev. Stat.*
§ 1, *ch.* 1, *part* 4, *title* 6—which in this respect differed

from ours, we having strictly no such division of the offense into grand and petit larceny) though not punishable with death or by imprisonment in the State prison, and not therefore within the statute definition, was still a felony at common law—that the statute definition only defined statute felonies, but that it did not interfere with those existing at common law untouched by the statute.

Another case in the same Court, *Carpenter v. Nixon,* 5 *Hill,* 260, illustrates still more clearly the proposition, that the provisions (of the statute) referred to by the definition, are to be read precisely as if the term *felony* were stricken out, and the words of the definition inserted in its place. The question arose upon the competency of a witness who had been sentenced on a conviction for petit larceny. The statute (1 *N. Y. Rev. Stat. title* 7, *part* 4, *ch.* 1, § 23) provided that "No person sentenced upon a conviction for *felony* should be competent to testify," &c., but that "no conviction for any offense other than a felony should disqualify," &c. Here the same Court, the same judge giving the opinion in reference to the same offense, and citing *Ward v. People,* held that the witness was not disqualified; because, though the offense still remained a felony at common law, it was not within the statute definition, which alone disqualified; and it is difficult to see how any other view could have been taken. The statute in reference to the competency of the witness had used the term, *felony,* as the only term descriptive of the offense, and the term therefore came within the statute definition; while the offense of petit larceny, though still a felony, did not; but it did come within the negative words of the section, as an "other" offense than that included in the statute definition. These two decisions are therefore in perfect harmony with each other, and both, as I think, clearly correct. See also *Shay v. People,* 22 *N. Y,* 317, which is to the same effect, and like the case last cited entirely consistent with that of *Ward v. The*

*People* in 3 *Hill*; as will be readily perceived by inserting the words of the definition in place of the word felony in the statutes referred to. These decisions were made, the first in 1842, and the second in 1843. This provision of the New York statute was adopted into ours in 1846. As a general rule, it is a fair inference that the legislature, in adopting a statute from another state, which has there been judicially construed, intended to give it the same interpretation it had there received by judicial construction. I see no reason for departing from this general rule in the present case, especially as I should be compelled to give it the same interpretation without the aid of these decisions.

I think therefore the charge of the Court below was correct, so far as it related to the right to arrest without having the warrant in possession.

But though Gore had a right, as I think, to make the arrest in a proper manner, without having at the moment the warrant in his possession; yet, to place the defendant under any obligation to submit to the arrest, the officer should have informed him of the facts, or at least of the offense for which he arrested him. But, instead of doing this, Gore simply told him he had a warrant for him. And when defendant asked to see it, Gore refused, saying he was not bound to show it, and, at once seized him and jerked him to the door. This conduct of the officer was well calculated to excite the suspicion of the defendant, and to induce him to believe the officer was acting in bad faith, and thus naturally tended to provoke the violence which ensued. The defendant, under such circumstances, might well believe he was resisting an illegal arrest, and lawfully defending his liberty.

Hence so much of the charge as informed the jury that if defendant drew the pistol with intent to kill, and if death had ensued, it would have been murder, was, I think, erroneous; and upon this portion of the case I concur with

my brother Campbell. The verdict should therefore be set aside, and a new trial granted.

MANNING J. concurred.

CAMPBELL J.:

Two principal questions are presented in this case. *First,* whether an officer can arrest without warrant, upon a charge of larceny, where the amount stolen is less than twenty - five dollars, and the offense was not committed within his knowledge or presence : And *second,* whether he can arrest, where a warrant has been issued, but is in the hands of another officer. And a third question is presented, partly but not entirely dependent on these, arising upon the charge of the Court.

If larceny of the degree mentioned is felony under our laws, then the arrest might legally be made upon such grounds of suspicion as appeared in the case. The consideration of the *manner* of the arrest, except as connected with the necessity for the possession of a warrant, will be taken up hereafter; as it is not necessary to dispose of the first question.

The general chapter on Criminal Procedure, in the Revised Statutes, contains this clause : " The term ' felony ' when used in this title, or in any other statute, shall be construed to mean an offense for which the offender, on conviction, shall be liable by law to be punished by death, or by imprisonment in the State prison." *Comp. L.* § 5954.

This section furnishes a definition, not confined to cases where the term is used in the Revised Statutes. It is made applicable to every law, future as well as existing. And, if there could be a felony not covered by the statute definition, no legislation could reach it without a very awkward circumlocution, inasmuch as the common law term is thus appropriated to a specific use.

If we consider the Revised Statutes together, even leaving out of view other laws having some bearing on the

question, we shall find the Legislature has made express provision for every offense; not leaving any case to its. common law consequences, but defining the punishment for all crimes. And in order to avoid any mistake, the statutes, after providing expressly by name for nearly if not quite every offense likely to be committed, which had been previously known to the law, contain a sweeping provision, that every common law offense, not expressly provided for, shall be punished by imprisonment in the county jail, or by fine, for a time and amount limited—§ 5958. A similar provision, varying in the extent of the punishment, had previously been in force: — *L.* 1840, *p.* 45. The common law now, therefore, is chiefly valuable for its . *definitions* of offenses, and not for its rules of punishment.

.By the Revised Statutes of 1838, provision had been made by chapter 2, title 1, part 4 (which corresponds with the chapter containing the sections referred to)ˋ for the punishment of accessories and other aiders and abetters, of any offense "*which shall be a felony at the common law, or by any statute now made, or which shall hereafter be made*." *R. S.* 1838, *p.* 651. At that time there was no such clause reaching undefined common law offenses as has been alluded to. The mode of trial was pointed out, and the principal felon was not required to be convicted first. In the Revision of 1846, whereby these provisions concerning accessories were substantially re-enacted, all allusion to common law felonies is dropped; and it is not reasonable to suppose it was done accidentally. Still less can we imagine it was designed to revive the common law absurdity, that no accessory should be tried before the principal felon had been convicted. I think the intro· duction of a specific definition of felony shows why the change was made; and that common law felonies were not alluded to because all felonies thenceforth were to be statutory. Any other construction leads to interminable confusion; and in no case more than in larceny; for it would.

require extreme ingenuity to determine, under our statutes on that subject, which had long abolished the common law test of twelve pence value, in what cases there might and in what there might not be accessories.

It has always been considered that when a statute takes up, and completely covers, a subject previously governed by the common law, the common law ceases to operate upon it, except where the statute has made no provision whatever. Our statutes certainly cover every class of larcenies, and provide how they shall be punished. They then provide that all offenses punishable in a certain way shall be felonies; and proceed to declare how accessories and principals, to offenses so punishable, shall be tried and punished. I can not perceive how any more decisive method could have been devised whereby to abolish the common law on this subject.

But petit larceny, although a felony at common law, resembled other felonies in only one feature. It was not punishable like others, and it was not a crime to which there could be accessories. The only point of resemblance was that it was attended by a forfeiture of goods on conviction. This element never existed in Michigan; and there was certainly very good reason for changing the classification of the offense, when it had ceased to retain a single feature common to other felonies. It has always been regarded as a petty offense, punishable generally by a summary conviction before a justice ; and I do not think there is any principle of policy, or any rule of construction, which can authorize a court to apply to it, under our laws, the severe and sanguinary rules applicable to heinous offenses. There may be some reason in allowing arrests for the latter on suspicion, and for allowing the use of extreme measures, even to the taking of life, to enforce them. But were any Legislature to provide expressly for such an exercise of power, as would authorize the taking of the life of a man only suspected of a petty theft, where he seeks to escape

without violence, their action would be justly deemed atrocious. In revising the criminal law to escape such consequences, I think they have succeeded, in what no one ever doubted they designed to do.

Had the section defining felony been adopted after a judicial construction of it in another State, even by a Court of last resort, I should still feel authorized to disregard that construction, if contrary to the plain intention. But although this section was adopted from New York, we must bear in mind that the changes in other statutes of Michigan, made at the time of its adoption, are not to be overlooked. This section was not adopted as an independent one, but as a part of a system, which did not in many respects conform to the laws of New York, either before or after its completion. And in regard to this very offense of larceny, our laws differ entirely from those. In New York, larceny is still defined as grand and petit larceny. Here there is no such distinction, and had not been since the early days of the Territory. And, when the distinction was abolished in England, it was deemed necessary by express language to declare the legal character of the new statutory offense, by making it subject to all the rules before governing grand larceny.

But the statute of New York has never received a judicial construction binding there or here. It has been decided there, repeatedly, that petit larceny does not disqualify a witness under a statute which disqualifies all persons convicted of felony. And in the last case decided, where the *dicta* to the contrary of some previous decisions were relied upon in argument, the Court treated the objection with very little ceremony: — *Shay v. People*, 22 *N. Y.* 317. While this case does not, perhaps, expressly decide the point in question here, the distinction is an exceedingly nice one. And this is the only decision made on the subject in the Court of last resort of New York.

The only case decided which is supposed to settle the

point before us is that of *Ward v. The People*, 3 *Hill*, 395, decided by the Supreme Court. The question there decided was, however, only that there were no accessories in petit larceny. The Court expressly say that it was not material to the case whether the statute did or did not leave it a felony; because it had no accessories at common law. And the Court expressed no doubt that the Legislature intended to make the offense of petit larceny a misdemeanor; but, at the same time, the Chief Justice was "inclined to think they did not accomplish their object." This certainly is not a binding decision, which can compel us to disregard that intention. And the New York Revisors, whose deliberate opinion is worthy of great respect, introduced the section in question with the understanding that it was to cover everything. In reporting it they say, "The term *felony* originally imported an offense for which the offender forfeited his *fief*, his lands and tenements, goods and chattels: 4*th Black*. 94. Such forfeitures have long been abolished, and the term has really no signification in our law. It is frequently used in statutes, and it is therefore desirable to give it a definite meaning. The definition proposed is conformable to the common understanding:"— 3 *R. S. of N. Y.* 836, 837. I am of opinion, for these reasons, that Drennan was not charged with felony, and that Gore had no right to arrest him without a warrant.

As the Court below decided that the evidence of a warrant was sufficient ground of suspicion, and that the offense suspected was a felony, the warrant was not introduced in evidence, and no ruling was had upon its legality, or the authority of Gore under it. If the offense was not a felony, then of course the charge was erroneous; because the other points never went before the jury for action. But the rights of an officer under a warrant become important on a new trial, and were argued fully on both sides, and should therefore be considered.

Two things are necessary to justify an arrest on a warrant; *first*, a warrant good on its face, and *second*, an authority in the person who undertakes to act under it.

If a warrant is upon its face void, then no officer can justify under it; although, as a general rule, no officer is bound to look behind a *regular* warrant coming from a proper jurisdiction. It is laid down without dissent, that no person is bound to submit to an arrest under a void warrant, or to an arrest made by an unauthorized person under a good warrant, or to an arrest made by an authorized officer under a good warrant, but not against the person arrested. In *Rex v. Weir*, 1 *B. & C.* 288, BAYLEY J. says, " It is of great consequence that magistrates should be careful to direct their warrants in such a manner that the parties to be affected by them may know that the persons *bearing the warrants* are authorized to execute them. The importance of giving such information will be easily admitted when it is remembered that according to the extent of the officer's authority his death may be murder, manslaughter, or perhaps justifiable homicide." COLTMAN J. in *Hoye v. Bush*, 1 *M. & G.* 775, approving and quoting this language, says, " It is of the essence of a warrant that it should be so framed that the officer should know whom he is to take, and *that the party upon whom it is executed should know whether he is bound to submit to the arrest.*" In *Howard v. Gossett*, 10 *Q. B.* 359, COLERIDGE J. uses this language: " Why is it necessary to state at all the cause on the face of the warrant ? Several reasons are given : not the least important is, that the party called upon to submit to the process of the law may know what it is that is charged against him, and for what it is that he is called upon to yield himself a prisoner. If no cause, or an insufficient cause appear, he takes his measures accordingly at the time; *and he must judge from the information communicated at the time.* Should he resist, and kill or injure the officer in

his resistance, and be brought to trial, it could not be contended that any fact could be added to the statement in the warrant to his prejudice." And further, "We may come nearer to the point and suppose, not only a good cause, but a good warrant, only the constable has left it at home, and arrests without any; the imprisonment clearly would be illegal; it could not be said to have been effected under and by virtue of the warrant; and surely no averment in pleading could be allowed to cure the defect." Lord Denman also uses very strong language on the subject. And the Court of Exchequer Chamber, while they differed from the Queen's Bench in holding the particular warrant valid, approve of their reasoning as applied to ordinary warrants. See also *Rex v. Whalley*, 7 *C. & P.* 245; *Rex v. Patience*, 7 *C. & P.* 775. The case of *Galliard, Appellant v. Laxton, Respondent*, just decided by the Queen's Bench, and reported in the American Law Register for March, 1862, (p. 305) is the only adjudged case, perhaps, which decides the precise point in issue here. In that case it was held a rescue was not illegal which was made of a person seized by officers, who had the warrant, but had left it in the station house. It was there held the warrant must be with the officer at the time of the arrest.

If it is not necessary that an officer should have a warrant with him when an arrest is made, then it would necessarily follow that every one would be bound to submit, upon the mere claim that he had a warrant — a principle which is condemned in the stongest terms by Lord Kenyon in *Hall v. Roche*, 8 *T. R.* 187. The cases certainly mean that the party arrested shall have a right to see the warrant at the time. And such is the doctrine laid down by the best authorities; although, if a party resists before an opportunity is given to the officer to comply with his demand, the officer may — if he has a good authority—secure the arrest first :— *Commonwealth v. Cooley,*

6 *Gray*, 350; *State v. Phinney*, 42 *Me.* 384; 2 *Hale P. C.* 116, *note;* 1 *East P. C.* 319.

The English practice, like our own, authorizes warrants to issue, directed not only to one person, but also to any constable. This covers the case of *Galliard v. Laxton.* And any constable to whom the writ is lawfully delivered becomes empowered to serve it. But a warrant can not be lawfully held by two officers at once, where they are not together. Otherwise the doctrine of arrest on suspicion would apply to misdemeanors as well as felonies; for what could be done by one could be done by every constable in the county. In New Jersey an arrest under such a warrant was held unauthorized, except by the possessor, in *The State v. Ward*, 5 *Harr.* 496. And our statutes contain several provisions implying the same thing. The law contemplates that a party arrested shall be brought forthwith before the magistrate; but it must be *upon a return of the warrant;* and until this return there is no provision for bail. The prisoner is required to answer the charge *as contained in the warrant of arrest:—Comp. L.* *Ch.* 118. If a *habeas corpus* issues, a copy of the warrant must be returned by the officer:—*Comp. L.* § 5221. And any person who is a mere stranger has a right, upon tender of fees, to have a copy of the warrant within six hours, under a penalty of $200:—*Comp. L.* § 5259.

It certainly can not be law that a person arrested is to be held until one of the many constables who happens to know or hear of a warrant can find where it is. The mischief to be guarded against is the unlawful interference with liberty; and if every one arrested must, at his peril, and without any information beyond the assertion of his captor, submit to detention, all the machinery of the law devised for the protection of the citizen becomes powerless. The consequences of such a doctrine would be so deplorable that no man could ever be safe against unlawful violence. Arrests for wrong purposes could always be made

effectual. Both reason and authority are in conflict with such a position. The law of arrest only gives rights to officers where it imposes duties; and the duty to serve a warrant can never attach where the officer can not return it as soon as its mandate is obeyed. The duty of submission to a lawful arrest is found in the law, side by side with the right of resistance to an unlawful one; and it is quite as important that no one should be unlawfully taken, as that every one lawfully accused should be made to answer.

But an equally important question arises under the charge of the Court. The jury were instructed that, as Gore had a right to arrest upon suspicion of felony, it would have been murder had Drennan killed him intentionally. This, I think, as the evidence stood on which the charge was made, was clearly erroneous. If Gore had reasonable suspicion which would justify him in making the arrest, the accused could not be liable to that extent for resisting, when the suspicion was not communicated to him. When he asked the cause for which he was wanted, he was not informed that he was suspected of felony, but was merely told that Gore had a warrant for him; which, if genuine, might have been for any grade of offense, or for a civil cause. And the officer when asked to show him the warrant, refused to do so, saying he was not obliged to show it; and forcibly collared, and jerked him out of doors, before he attempted any resistance. There was no resistance before the officer had time to give the information. I think it would be exceedingly difficult to find any authority which can justify such an arrest; or which can hold a defendant responsible for a knowledge of a fact wilfully concealed from him. Such conduct in officers of the law can not, in my judgment, be too severely reprehended. It can hardly fail to provoke violence.

I am of opinion that a new trial should be granted.

MARTIN CH. J. :

The power and duty of officers to arrest, without process, persons charged with crime, are derived from the common law, and not from the statute. They are conferred and imposed in all cases of felony; but not in those of misdemeanor, except when committed in their immediate presence. When we ascertain, therefore, what are felonies at the common law, we know for what common law offenses persons charged may be arrested without process. Larceny was such an offense. The statutory definition of the word felony was not, in my opinion, designed to restrict this power or duty; or to have any other effect than that of a definition; although it may aid, perhaps, in the construction of other statutes. The word has now no peculiar value ; for no consequences peculiar in the common law, such as forfeiture of lands, &c., attach to it. The statute itself only defines the word as used in it; leaving the common law definition intact; and does not purport to go beyond such statutory use.

The power of the officer being a common law power, it would seem to follow that no change by statute in the punishment of an offense known in the common law as a felony, and the abolition of the penalty peculiar to felony, and the consequent necessarily new definition of the term, could impair or affect that power. If the Legislature should make murder or robbery punishable by fine only, still the power to arrest would remain the same as it was when the penalty was death; for such power depends upon the nature of the offense, and not upon the severity of. the punishment. It was conferred for the protection of society ; and the same reasons will exist for its exercise now as heretofore, however crime may be defined and punished. I hold with my brother Christiancy that the statute has not impaired the common law power of officers [to arrest offenders; and I concur with my brethren also in the reason assigned for setting aside the verdict.

*New trial granted.*