THEODORE YATES, Plaintiff in Error, v. THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

Where the prisoner was pursued in the night season by a shouting mob, threatening his life, and he was seeking to escape under just apprehension of great bodily harm if overtaken by them, and in his flight was seized by some person whom, in self defense, he instantly kills, and the person thus killed proves to be an officer seeking his arrest, on trial of the prisoner for the crime of murder in killing such officer, it becomes material for the prosecutor to fix upon the prisoner, at the time of the killing, presumptive knowledge of the official character of the deceased.

This presumptive knowledge of the prisoner at the time of the killing, that the deceased was then and there an officer, etc., may be established by circumstantial evidence, such as that the deceased was clad in the uniform and insignia of his office, and that it was so light at the time that the prisoner must have seen such uniform, etc.

But circumstances, to be competent evidence for such purpose, must have specific connection with the time and place of the killing, so that the circumstances being true, the presumption of knowledge would arise therefrom.

The condition and power of a street lamp to diffuse light four months after the killing, is not competent evidence of its condition and power in that respect at the time of the killing, without showing all other conditions affecting its power to be the same.

BROWN, J. The plaintiff in error was convicted at a Court of Oyer and Terminer (Mr. Justice BARNARD presiding), held for the county of Kings, at the city hall of the city of Brooklyn, on the 24th day of January, 1865, of the crime of murder in the first degree, in killing one Charles Curran. The judgment was removed into the Supreme Court by writ of error, where it was affirmed at the General Term of the second district. From this judgment the prisoner brought a writ of error to this court.

On the evening of the 1st of October, 1864, the prisoner was assisting Mary Ann Butler to remove her furniture from one house to another. On their way, and about 9 o'clock in the evening, they stopped where a large number of persons were assembled at a political meeting, on the corner of Hudson avenue and Plymouth streets, Brooklyn. A quarrel ensued between the prisoner and a portion of the crowd,

some one offering to bet that McClellan would be elected, and the prisoner offering to bet that Lincoln would be elected, in which, as his witnesses say, he was attacked and beaten, knocked down, and his clothes torn and his face covered with blood. At this time he fired a revolver, which took effect by a slight wound upon the head of one McKenna, a bystander. The prisoner then ran away, pursued by a multitude of persons crying out, "stop the murderer and kill him." The deceased police officer, Curran, joined in the pursuit, being about two yards in advance of the others, and at the distance of five blocks from the place where the affray commenced, seized the prisoner, who immediately exclaimed, "let go, or I'll shoot you." Curran had his head pressed against the prisoner's breast, and called for some one to catch the pistol. At this time Curran raised his head, when the prisoner fired the pistol and the former fell, fatally wounded. He was then in the uniform of the police force, having upon his person the usual cap and shield of the metropolitan force. The prisoner then fled, followed by the crowd. Several other shots were fired, but by whom does not distinctly appear, except from the prisoner's own declaration at the time. He continued his flight, and entered the store of a Mr. Markey, when he said, under apparent excitement, "look out, I have shot two men." Leaving Markey's store, he ran, still pursued by the crowd, into a place called Tammany Hall, where he was arrested by a body of policemen. At the time of the struggle the night was dark and raining. There was some contradiction and difference of statement between the witnesses, but the facts are substantially as I have given them. It was also proved upon the trial, that the prisoner was near sighted, the materiality of which will appear presently. One of the witnesses for the people, Daniel Cannen, says Curran was shot about four yards from the lamp post; and John Larkin, another witness for the people, testified that Curran and Yates, at the time, were within half a block of a lamp, but there was no light shining upon them; while John Maloy, nother of the People's witnesses, testified that he lighted the lamp referred to at 6 o'clock that evening; which he qualified

upon his cross-examination by saying he had no recollection of lighting that particular lamp that evening. There was no communication made to the prisoner at the time, that Curran was a police officer, nor was there any demand made upon him to surrender his person to the custody of an officer, nor was there any proof that the deceased was personally known to the prisoner.

In the progress of the trial it soon became a material inquiry whether the prisoner was aware of the character of his pursuer. There was no proof of actual knowledge, and then occurred the inquiry whether the jury might not be warranted to infer his knowledge from the attending circumstances. Hence the proof of the officer's uniform, and the prisoner's defective vision, the street lamp and the vicinity thereto of the prisoner at the time of the killing. All these circumstances became of vital consequence, for if there was nothing from which the prisoner's knowledge of the official character of the deceased might be inferred, the measure of the offense charged would descend from murder into one of the degrees of manslaughter. There was positive proof given by the prisoner that the lamp shed no light on the deceased and the prisoner at the time of the fatal rencounter. To rebut and take away the force of this evidence, the prosecution were allowed to prove, against the prisoner's objection and exception, by Sergeant Crowe, that on Sunday evening, three days before he was examined, and nearly four months after the occurrence, he went down to the lamp spoken of, to see by actual examination and experiment what effect the light of the lamp had, and how far its rays extended. He found it to be an ordinary street lamp — old fashioned square block lamp; and that the rays of light from it extended fifteen feet, and gave such light that he could read the headings of the articles in the newspaper *Eagle;* the night was cloudy. I submit that this was not evidence for any purpose. If it was material to the issue before the jury that the light was such at the time as must have apprized the prisoner of the character of his pursuer and the object of the pursuit (which all must admit), proof of the condition of the lamp

and its power to diffuse light on the 21st of January was no evidence of its condition and power on the 1st of October preceding. The power of a street lamp to emit rays of light and diffuse them to any considerable distance, depends upon a variety of conditions — the purity and transparency of the medium through which the rays are projected; the material from which the light is generated, and the manner of its generation and diffusion; and, quite as much as anything else, the state of the atmosphere at the time. · A flame proceeding from the best qualities of inflammable gas, and a light proceeding from the oils and fluids of domestic use, in their power of diffusing light at a given distance, hardly admit of a sensible comparison. Nor does the opaqueness or transparency of two different atmospheres to admit or resist the diffusion of such light. And the jury were allowed to convict the prisoner of a capital offense upon the assumed theory that the light at and around this street lamp was not different on the 21st of January last from what it was on the 1st of October preceding. There was no proof that the structure of the lamp was the same at the one time as at the other. Nor was there any evidence whether the combustible material used at either time was the ordinary inflammable gas, or some of the spirits and oils in domestic use; or what it was. The condition of the lamp and the extent of the diffusion of its rays of light at the time of the killing was legitimate evidence upon the principal question involved in the trial. But its condition and the distance to which the lamp which the witness, Sergeant Crowe, saw at the same place three or four months afterwards, shed its light at that time, was an element irrelevant and foreign to the issue, and could not fail to prejudice the prisoner in the minds of the jury, and lead them to a conclusion which they might not have adopted had the evidence been excluded. For these reasons, and not without hesitation, I think the judgment should be reversed. I am the more inclined to this conclusion because the jury were mistaken in the nature of the crime of which the prisoner was guilty. Carrying concealed upon his person a deadly weapon, was a great aggravation of his guilt. It was his misfortune to use it, with

fatal effect, when pursued by a multitude of exasperated men, in a moment of great excitement and fear, upon the person of an inoffensive officer in the plain imperative discharge of a public duty.   The deadly and destructive weapon, and the innocent character of the deceased policeman, account, perhaps, for the severe verdict rendered by the jury.   Still it was not justified by the evidence.   The premeditated design of the statute — the malice aforethought of the common law — was wanting.   Nor was the act "imminently dangerous to others, evincing a depraved mind regardless of human life," within the meaning of the second subdivision of section five of the statute.   Without one of these elements the crime was not murder in the first degree.   Whatever we may think of the claim that the act was committed by the prisoner in the exercise of the right of self defense, it cannot be denied or doubted that his principal, if not sole effort, seemed to be to make good his escape from his pursuers.

The judgment should be reversed and a new trial ordered, at the Oyer and Terminer.

POTTER, J.   The prisoner has been convicted of murder in the first degree.   To be guilty of the commission of this crime under our statute, it must have been perpetrated either, "1st. From a premeditated design to effect the death of the person killed, or of some human being; or, 2d. To have been perpetrated by an act immediately dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design, to effect the death of any particular individual; or, 3d. To have been perpetrated in committing the crime of arson in the first degree."   It is not claimed that the act was committed under the second or third of these subdivisions.   The indictment charges it to be under the first subdivision of the above statute definition of the crime; and, of course, the prisoner could only be found guilty according to the charge.   As it appears to me, the verdict of the jury is so clearly against all evidence of the commission of the offense charged that we ought to scrutinize the proceedings of the trial with jealous care to discover, if we may,

whether any proceedings on the trial, or the rulings of the judge on the admission or rejection of evidence, has in any way influenced the jury in coming to the conclusion they did, as to the guilt of the prisoner. But first, it is perhaps proper to show that the evidence does not justify the verdict.

Taking up the evidence in the order of the occurrence of the events, it will appear that on the evening of the day in question, the prisoner, in the absence, as is conceded, of all evidence of motive to commit the act charged, in the absence of all malice, premeditated or otherwise, was engaged with two other persons in assisting one Mrs. Butler, an acquaintance, in removing from a house in High street to one in Little street, in the city of Brooklyn. On their way from the one house to the other, they passed the corner of Hudson avenue and Plymouth street, where there was a political meeting. It was a dark, rainy night. There was speaking at the meeting, and some fireworks, an outdoor stage, and people standing under umbrellas. Neither the prisoner, Yates, or the party of persons with him, went there to participate in the proceedings of this meeting. While halting near the meeting, some person within their hearing proposed a bet of fifty dollars that McClellan would be elected. The prisoner said he would bet ten dollars that Lincoln would be elected. The reply that followed this was, "Let's give it to the son of a bitch." Then, in the language of the witness, "they pitched on to him (the prisoner) and knocked him down and kicked him; there was more than a dozen beating him. I saw Yates get up with his face all bloody, and then I heard the report of a pistol, and then Yates ran off." There was no impeachment of this evidence; there is not a word of contradiction of it. There is, it is true, a claim of contradiction — in that several witnesses, some of whom were listening to the speaker, did not see this attack upon the prisoner, or hear what was said during the fight. This negative evidence amounts to nothing in the scale.

It was a brutal and cowardly attack of some dozen men upon one man, a stranger to them. The prisoner was justified in defending himself with all reasonable means within

his power, and he behaved but with reasonable prudence in attempting his escape by running from such a crowd: but, nevertheless, this crowd pursued him. Up to this time surely there was no act on the part of the prisoner showing premeditated malice. He had been beset by a mob, pitched upon by more than a dozen men, knocked down and beaten, and without provocation, as appears, on his part, except to offer a bet on perhaps his preferred candidate. He had not interrupted or disturbed the meeting — at all events, the violence and abuse he received was greatly disproportioned to the offense he had offered to the friends of this Brooklyn meeting. If a dozen men were kicking and beating him, his firing his pistol at that time was so nearly, if not entirely, justifiable, that it at least takes away all basis for the claim, up to that time, of premeditated malice on his part. But it is said that after firing his pistol he ran. Well he might have run from such a body of men. Any reasonable man, I think, might have desired to escape. But is his running away any evidence of malice, or of premeditation to commit an offense? It is evidence of the very reverse of that. The crowd followed him, they halloed after him. He was overtaken. He was seized, and as it happened, the person who so seized him was a police officer. But how did the prisoner know that? He was already wounded and bloody; he saw the crowd; he doubtless heard their shouts, for the evidence is they shouted; pistol shots were fired behind him, he doubtless heard them; he struggled to escape; for aught that appears, he may have supposed that the person who seized him was one of the mob who first attacked him, and was trying to detain him for the remainder of them who were approaching with an increase of numbers; he threatened to shoot the person who was holding him if he did not let him go; the deceased would not let him go; the prisoner did shoot, and again escaped. The crowd of a dozen who made the first attack had increased to from fifty to one hundred, and were still pursuing. The act the prisoner had just committed was an act done under the influence of panic, fear and excitement. I have failed to see any evidence of premeditation or malice, looking at the case from the prisoner's stand point.

He was endeavoring with all diligence to escape from mal-treatment, if not from death. True, a different view is obtained from the stand-point of the prosecution. To them, the prisoner seemed to have fired upon and wounded a citizen; that while he was being pursued by the police for the purpose of being apprehended, he shot and killed a police officer. These are the two opposite theories of the case. It is seen, however, that the latter theory fails to start with the origin of the affair. If there be added to this theory of the prose-cution the circumstances of its origin, even that fails of present-ing the feature of premeditation and design to effect death. It can only be imagined, or inferred from one circumstance, in the absence of positive evidence. That circumstance is, that the prisoner knew that Curran, the deceased, was an officer. There is no evidence that the prisoner personally knew Curran. There is no evidence that he knew that Cur-ran was an officer. It was a dark, rainy night. It may be supposed the prisoner was under too high a state of ex-citement for the exercise of cool deliberate judgment and reflection. He had such an extreme infirmity of vision that he might not have been able, even if cool and collected, to have seen the evidence of official power. True, there is evi-dence that the deceased officer wore his uniform cap and his shield; but there is no evidence that in that dark night these were preceptible to the prisoner. As this knowledge of the prisoner that the deceased was an officer, is the only ground upon which to base malice, premeditation and design, it is necessary that this point should be established beyond a doubt. How is the fact proved? Not at all by positive evi-dence, and by no circumstance from which it can be inferred, except as we have stated, that the deceased wore his uniform cap and his shield. This inference is not strengthened, as is claimed, because the homicide was committed within about twelve feet of a lamp post, for one of the witnesses for the people swears there was no light there. True, a lamp lighter was produced who swore positively, on his direct examination, that he lighted the lamp on the corner of Adams and Water streets that night at six o'clock, but on his cross-examination

he took it back and swore that he had no recollection of lighting that particular lamp, and further testified that lamps often went out, particularly on rainy nights. This evidence of knowledge, if it amounts to anything, is too feeble, too uncertain, too unreliable, in my opinion, to permit the case even to go to the jury in such a case. And there is also the positive evidence of one witness called on the part of the people, that there was no light there.

The malice and premeditation upon which the conviction was had, it is seen, is based alone upon the fact of the defendant's shooting an officer. It is not claimed, and indeed it could not be, that he was guilty of the offense found by the verdict of the jury, unless the prisoner had such knowledge. It was otherwise a justifiable act of self defense. The facts to prove such knowledge are, and are only, that the officer had on his cap and shield; but there is no evidence that the officer made himself known as such — none that he even demanded him to surrender, or that he told him he arrested him. How conspicuous these emblems of his office were, is not explained. To meet this only inference of knowledge by the prisoner (for if he had knowledge, it is only to be inferred from the fact the officer wore his tokens of office), it was shown to be a dark night. Then, in the absence of evidence that the prisoner personally knew the officer — in the absence of certain evidence of there being any light at the place, but with positive evidence to the contrary — with the almost certain evidence that the prisoner could not have distinguished him as an officer, even by daylight, on account of defective vision, the verdict of a jury, guilty of murder in the first degree, was indeed a strange and unaccountable verdict. I am clearly of opinion that it is against evidence.

On the trial, after the people had rested and the defendant had closed his evidence, the court allowed the prosecution, under objection by defendant, to offer new testimony. So far as the testimony was offered to rebut that offered by the defendant, I do not think it was error. Five witnesses were then called who severally testified, in substance, that they saw nothing of a row or a fight previous to the firing of

the first pistol by the prisoner. Although this amounts to comparatively nothing against the positive evidence to the contrary, it was offered doubtless for rebutting evidence by way of contradiction; but the sixth witness was called to prove an experiment made by him on Sunday evening preceding the trial, and how far he could see by the light of a lamp which was located at the corner of the streets where the homicide was committed, and how far the rays of light extended on that Sunday evening. This was objected to as not rebutting evidence and as irrelevant, and had before been objected to as not a proper line of examination. These objections were all overruled by the court and exception taken. Such a ruling by the court in the presence of a jury, was at least to them a legal intimation, that such evidence was material and proper, and that it was their duty to consider it. This ruling may have misled the jury; it doubtless did, and I think it was an erroneous ruling. First, because at that time there had been no reliable evidence that the lamp was lighted on the night of the homicide, but the contrary; Second, there was no proof of the difference in the shades or degrees of darkness between the night of the homicide and the night of the witness's experiment; Third, there was no evidence of the difference in the eyes of the witness, and the eyes of the prisoner, as to their focal point; and, Fourth, more than all, this was not rebutting evidence, but was evidence which the defendant could not be expected to meet at that stage of the trial.

For these reasons I am of opinion that the judgment of the General Term and the conviction should be reversed.

Judgment reversed and a new trial ordered.