CROOM *v.* THE STATE.

1. To slay an officer to avoid being taken into custody, knowing that his object is to make an arrest for felony committed several months previously, is murder; but done suddenly, without knowledge of his purpose or official character, and without malice, it is manslaughter. Belief, or reasonable grounds of belief, would be equivalent to knowledge.

2. A white officer, with a gun and a *posse*, but without a warrant, attempting at night to arrest a negro felon in the dwelling of his father, was slain, the only words used by the officer indicating official character or a purpose to arrest being, according to some witnesses, "You are mine," or, according to others, "You are my meat": *Held*, that on the trial of the negro for the homicide, the milder form of expression should not have been recited by the court in charging the jury without some allusion to the other, the pressure of the case as between murder and manslaughter being upon whether the conduct and language of the officer gave sufficient notice of a purpose to arrest for felony, rather than to molest by mere violence for some lawless object.

July 12, 1890.

Murder. Criminal law. Manslaughter. Charge of court. Arrest. Before Judge BOWER. Worth superior court. October term, 1889.

Reported in the decision.

J. W. WALTERS, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, and W. N. SPENCE, solicitor-general, by D. H. POPE, for the State.

BLECKLEY, Chief Justice.

Croom, a negro, killed Hamlin, a white man, in August, 1889; and on the trial of an indictment therefor, he was found guilty of murder and sentenced to be executed. The evidence made in substance the following case : Some months previous to the homicide (according to a part of the evidence eleven months, according to another part of it from two to six months), Croom shot a railroad boss named Strickland (not killing him), and a warrant issued for his arrest. He

absconded, and kept out of the way until the night of the homicide, visiting his father's house, which seems to have been his home, only twice during the interval. The warrant was in the hands of the marshal of Ty Ty, one of the villages of the county, who, without delivering it to Hamlin, showed it to him and told him if he would arrest Croom, he would divide with him a reward of $25.00 which he, the marshal, had been offered for making the arrest. Hamlin, with a *posse* of three men, went to the house of Croom's father, in the night-time. Leaving two men outside, and keeping the other with him, he knocked at the door for admission, the inmates of the house then being, besides Croom, his father, mother and sister. The father and mother came to the door, and found there Hamlin with one of his *posse*. Hamlin requested the father to let them in, and inquired if anybody was there except homefolks. The father answered, "No." They told him they wanted to go in and make a search to see, not saying of whom they were in search, but that they were hunting for a man. They did not say for what they wanted him. Hamlin was armed with a Winchester rifle, and Croom's mother wanted to know of him what authority he had to come in her house. According to her testimony, she said to him, "Mr. Hamlin, where is your warrant for searching my house?" and he held his gun up and said, "Here is my warrant." The father testified that he asked them if they had a warrant or anything with which to search the house, and that Hamlin held up his gun, slapped it and said, "This is my warrant." The mother, if not the father, gave them permission to enter, and they did so, Hamlin carrying in his gun and the other man having a pistol in his pocket. They started to go from the main room into a small room, and met the accused coming out. Hamlin said to him, "Halt," or "Hello, John"; the latter answered,

"Yes, sir," or "Hello, Mr. Hamlin." Hamlin responded, "You are mine," or "John, you are mine." Of two witnesses for the State, one gives the former, the other the latter form of the response. The mother testified that the response was, "Consider that you are my meat." In her cross-examination, she said it was, "You are my meat." The father testified it was, "You are my meat to-night." The accused instantly fired a pistol at Hamlin, the ball hitting him just above the eye and causing death within a few hours. According to the evidence for the State, Hamlin, when shot, was holding his gun with the muzzle pointing to the floor, and not in a shooting position. The mother testified that the gun was drawn on the accused as if Hamlin was going to shoot him; that he raised the gun and fixed to cock it, but she did not know whether it was cocked or not; the father testified that he saw him raise up his gun, and then turned away his head because he did not want to see his son shot down. After shooting Hamlin, the accused said to his mother, "Get out of the way, I want to get the other one." The man who was with Hamlin, thinking that he himself was shot, ran out of the house and to the gate, five or six yards from the house. After stopping, he saw the accused on the porch, who forbade his return into the house. The accused then ran. off and made his escape. It is quite certain from the evidence and the statement of the accused, taken together, that whilst Hamlin and his companion stood at the door, and the conversation between them and the parents of the accused was going on, the accused left the house through the back door, and was halted by one of the *posse* stationed in the rear of the house, and that he (the accused) turned round and re-entered the house. The man who halted him then ran upon the porch and cried, "There he is, boys," and immediately afterwards he heard Hamlin

accost him, and then heard the pistol fire. A short time before Hamlin was killed, he himself had shot and killed a negro in Ty Ty named Roberts, whilst trying to arrest him for gambling. This appeared from one of the State's witnesses; and the mother of the accused testified that he had heard of it, and also of the killing of two negroes at some railroad shanties, or at a neighboring village, as to which killing other witnesses testified, but it appeared that Hamlin was not present when it occurred. Hamlin had acted as bailiff three or four years previously, and was elected as a regular bailiff a very short time before he killed Roberts. The mother of the accused knew that Hamlin was a bailiff, but could not say whether the accused knew it or not. He said, in his statement to the jury at the trial, that he did not know Hamlin was an officer; that if he was one, he did not know it; that when he, the accused, shot Strickland, Hamlin was no officer. The reason he assigned for shooting Hamlin was, that he was afraid of him, and thought Hamlin was going to shoot him, and that it was necessary to shoot to save his own life.

Various details, both in the evidence and in the prisoner's statement, have been omitted; but the foregoing is the substance of all that is material. The motion for a new trial, besides the general grounds, sets forth a special ground, assigning error on the charge of the court, the court having charged as follows: "If you believe from the evidence in the case, that the officer went there to arrest him, and called him and told him he was his, and he answered back, or if the officer called his name and told him he was his and the officer made no effort to hurt him, and he shot the officer under these circumstances, it would be murder, although the officer may have had a gun hanging down by his side or in his hands at that time."

1. This instruction hugs the evidence for the State

so closely as to leave the jury no room for grading the homicide otherwise than as murder, provided they credited the evidence of the State's witnesses and accepted the same in its letter.   It makes the question, not only of guilt or innocence, but of murder as distinguished from manslaughter, turn upon a single pivot, and upon a part of the evidence instead of the whole of it.   And that the jury must have so understood it, is manifest; for nowhere else in the charge is there anything to relax this iron-bound rule prescribed to them from the bench.   On the contrary, the sentence immediately preceding the one under review reads thus: "If you believe from the evidence that the defendant, at the time he did this killing, had no necessity to do it; if you believe at that time that his life was not in danger, that the circumstances were not such as would make a reasonable man believe that his life was in danger at the time, and if there was no necessity for the killing, you should find the defendant guilty of the offence of murder."   Instead of laying down this narrow rule, the court should have charged that, in the absence of necessity, or of appearances to warrant a reasonable belief that it existed, the killing would be unlawful and would be either murder or voluntary manslaughter; that, if it was done with knowledge or reasonable grounds of belief that Hamlin intended and was endeavoring to make an arrest for the felony with which Croom was charged, it would be murder; but if the killing was done suddenly, under the surprise of a night visit by an armed man, without knowledge of his purpose or official character, or reasonable grounds of belief as to the same, and without malice express or implied, it would be manslaughter.   The warrant not being in the hands of Hamlin, but in the possession of the marshal of Ty Ty, who was not present, was no authority to Hamlin to make an arrest.   Whart. on Hom-

icide, §242; Rex *v.* Patience, 7 C. & P. 775; Cod *v.*
Cabe, 13 Cox, 202.   Nevertheless, there was ample au-
thority in the law itself; for an officer may arrest for
felony on probable grounds without warrant.   Cod *v.*
Cabe, *supra;* 2 Hale P. C. 85; 1 Am. & Eng. Encl.
Law, 733; Drennan *v.* People, 10 Mich. 169; McCar-
thy *v.* DeArmit, 99 Penn. St. 63; Rohan *v.* Sawin, 5
Cush. 281; Hobbs *v.* Branscomb, 3 Camp. 420; Hol-
ley *v.* Mix, 3 Wend. 350; People *v.* Pool, 27 Cal. 572.
An officer may even arrest without warrant for an
offence less than felony, where the offender is endeav-
oring to escape, or for other cause there is likely to be
a failure of justice for want of a magistrate to issue a
warrant.   Code, §4723.   And to prevent a failure of
justice, a private person may arrest for felony upon rea-
sonable and probable grounds of suspicion.   Code,
§4724; *Long* v. *State,* 12 *Ga.* 293; Whart. Crim. Pl.
& Pr. §13; 1 Am. & Eng. Encl. Law, 741, and cases
cited.   Had Hamlin been no officer, but only a private
citizen, Croom ought to have submitted to the arrest
without resistance, provided he knew, or the circum-
stances put him upon notice, that an arrest was in-
tended.   A private man has quite as much power to
arrest a fugitive felon, where the emergency calls for
immediate action, as a public officer, and while so doing,
is equally under the protection of the law.   To kill him
would be murder, the same as to kill an officer, where
nothing appeared to grade the homicide, save that he
intended and was attempting to make an arrest.   But
the fugitive, though not justified in killing him to avoid
arrest, might be relieved from the imputation of malice
if he were ignorant of the purpose and intention of the
attack made upon him or his liberty.   It would not
necessarily follow, under all circumstances, that the
knowledge of being subject to arrest for a given offence
would be equivalent to knowledge that an arrest for

that offence was contemplated in the particular instance. No doubt it would be a powerful factor in the determination of the question ; yet, the question would be for the jury and not for the court. So, where the arrest is attempted by an officer, knowledge of his official position or character would be of great weight in bringing home to the fugitive notice of his purpose ; whilst ignorance of it, with no warrant in his possession to vouch for him, would reduce the officer to very much the same level as if he were a private citizen. Knowledge or notice of his official character, or of his presence for an official purpose, would be material. 1 Russ. on Crimes, 835 ; Whart. on Homicide, §241 ; Yates *v.* People, 32 N. Y. 509 ; Rex *v.* Ricketts, 3 Camp. 68, and note. Irregular conduct of the officer at the time may be misleading. Roscoe's Crim. Ev. 801 ; Drennan *v.* People, 10 Mich. 169 ; Bellows *v.* Shannon, 2 Hill, 86 ; State *v.* Curtis, 1 Hayw. 471. Ordinarily, no doubt, the inhabitants of an officer's bailiwick are presumed to know him as an officer ; but this bailiff had been recently elected, the accused had been absent from the neighborhood, and it might well be true, as he said in his statement, that he was unaware of his being an officer. The charge of the court made no allusion whatever to that question, and certainly the words of arrest used, taking either version of them, were not explicit, but quite informal. They were so ambiguous that little or no information could be obtained from them indicative of Hamlin's official character. No form of words in making an arrest is necessary. If, under all the circumstances, Croom believed or ought to have believed that the object was to arrest him, to take him into custody as a prisoner to answer the charge of felony, there was no excuse for the killing and nothing to mitigate it. But surely the question of mitigation was one for the jury, as well as the question of justification. The

court did charge upon the subject of voluntary manslaughter, in these terms : "If you believe from the evidence and circumstances that there was no malice express or implied, and that the killing was done under a sudden violent impulse of passion by the defendant, and, under the rules I have given you, that the officer was the assailant, that he was a wrongful assailant and not a rightful assailant, then it would not be murder, but voluntary manslaughter." This made it necessary, in order for the homicide to be graded as manslaughter, for the officer to be found in the wrong, ignoring the fact that he might be in the right and the accused not know it. This conflicts with the principle recognized in *Davis* v. *The State*, 79 *Ga*. 767, and in many of the authorities above cited. Moreover, being expressed in general terms and not applied to specific facts, like that part of the charge pointing out exactly what would render the accused guilty of murder, it would by no means weaken the effect of that, or give the jury any more scope under it for finding manslaughter, than, taken by itself, it afforded; and we have already seen that it afforded none at all. Nor did the court intend, by adding what we have quoted as to manslaughter, to relax or modify anything previously laid down. This is shown by the words in the quotation, " under the rules I have given you," by which words all the court had said in reference to murder was preserved and virtually repeated.

2. The real pressure of the case, as between murder and manslaughter, was upon whether the conduct and language of the officer, taken in connection with all the circumstances, indicated to Croom a purpose to arrest him for felony, rather than to molest him by mere violence for some lawless object. Hamlin had shortly before that time killed a negro unlawfully; for he could not lawfully kill him merely because he ran from him

to avoid arrest for a misdemeanor. Croom had heard of this killing. He had also heard that two other negroes had been killed; and they had been killed, but not by Hamlin. There is some probability, therefore, that he might, as he said in his statement, be afraid of Hamlin, and although any fear for his life might have been groundless, he nevertheless may have entertained it, and if so, may have acted under a greater sense of provocation and with more haste than he otherwise would. Let us suppose that it did not occur to his mind that Hamlin's business or purpose was to arrest him for the felony, but that it was to do him some violence, and that under that belief, entertained *bona fide*, having first attempted to make his escape and being prevented by one of the *posse* stationed behind the house, he shot Hamlin without premeditation or malice, in the hurry and heat of running to and fro to avoid his apprehended violence, would the homicide be the same grade of offence as it would if committed to prevent an arrest? Suppose the colors reversed, and that a white man had killed a negro officer under such circumstances, would it not be thought needful to a fair trial and legal conviction, that the possibility of this being the true state of the case should be submitted to the jury. We cannot see the whole truth, where conflict occurs between men of different races, without taking into account the natural law of race influence upon thought, feeling and conduct. That negroes are more prone to entertain unfounded fears of white men than white men are of negroes, is a fact too well-known to admit of question. And while unfounded fear is no excuse for homicide, it may serve to explain why a mind under the shock of a nocturnal surprise, might be thrown off its guard and fail to interpret correctly conduct which to a mind not so agitated would be easy of comprehension. This

being so, it was not, as we think, a fair and equal submission of the case to the jury for the court to recite in its charge the milder form of words attributed to Hamlin by the evidence, upon the use of which the shooting immediately followed, and make no allusion to the more aggressive form.   Why should the jury be told that if the words used were, "You are mine," the consequence, on certain conditions, would be murder; and not told what the consequence would be if the words were, "You are my meat"?   It is evident that "You are mine" is the better shape for the State, and "You are my meat" the better shape for the prisoner. Because, to say to a man, with a gun in your hands, that he is your meat, is suggestive of slaughter, and well-calculated to make him overlook any probability that you intend to arrest him, and provoke him to treat you as if you had come for something else.   He might have no reasonable grounds to fear you, but he might fear you all the same, at least to the extent of losing his presence of mind so far as not to realize at the moment that he was a fugitive and that you had come to arrest him on that account.   There is another reason why there should have been no recognition from the bench of one form without also recognizing the other. One of the forms came from the State's witnesses, the other from the witnesses of the defendant.   To adopt the form supplied by the State's witnesses, and make that the sole basis of instruction on the subject, would have the appearance of endorsing those witnesses and giving them a sort of preference, the influence of which might, consciously or unconsciously, be extended by the jury to other parts of the case.   Indeed the charge followed the State's witnesses not only as to the words used by Hamlin, but somewhat as to the position of his gun.   Touching neither of these matters was the alternative favorable to the defendant, put to the jury on the

specific facts as proved by his witnesses.    The jury were nowhere instructed expressly that if Hamlin said "You are my meat," and raised up his gun as if he were going to shoot the defendant, what effect this would have in grading the offence.    Surely, if, as matter of law, the court could instruct the jury how to grade by one side of the alternative, instructions equally explicit could and should have been given touching the other side.

It is proper to add, that what we have said in this opinion is not to be taken as any intimation that we believe the theory of the defence is well-founded in fact, either as mitigation or justification.    On the contrary, we see not the slightest objection to the verdict of the jury as the outcome of the evidence, and had there been no material error in the charge of the court, we should have left it undisturbed.    But in a case of life and death, where the evidence is conflicting, a verdict rendered under an erroneous charge from the bench which may have done serious harm to the accused, is illegal and should be set aside without regard to the opinion of this or any other court as to the guilt of the accused. The law will take the life of no man, whatever may be his color or condition, without first affording him a legal trial.                          *Judgment reversed.*